### ABRAHAM GUEST v. JOHN OPDYKE.

1. Where the tenant of a farm makes a verbal contract with a third party to work the land on shares, the grain to be divided by the bushel, and both occupy the same house, the grain grown on the ground, when cut and in sheaf, may be distrained by the landlord for rent due him.

2. Such agreement to work the land on shares is not a lease; the occupier is simply a tenant in common with the lessee of the growing crops, and the common interest continues until a division made.

Guest v. Opdyke.

3. Under the 8th section of the statute concerning distresses, a landlord may " seize *all* or any wheat, rye, &c., or any other produce whatever growing or being on the premises." The power of distress, as to such articles, is not limited to grain growing or being on the premises, belonging exclusively to the tenant.

4. The occupier under the agreement is not entitled to the benefit of the act of 18th March, 1851, exempting property to the amount of two hundred dollars, from distress—not being tenant of the lessor and there being no privity of contract between them.

Error to the Circuit Court of the county of Morris.

Charles Bodine and Peter Gulick, being the lessees of defendant's farm for one year from the 1st April, 1860, entered into a verbal agreement with the plaintiff, to the effect that he should work the farm on shares. Gulick was to occupy a part of the house and the plaintiff the residue, and the latter was to furnish the seed and team, and gather and thresh the grain, and was to have one-half the grain, to be divided by the bushel. The straw was to be left on the place. The wheat and rye, raised by the plaintiff under this agreement, were cut and in the sheaf and were being threshed when the defendant, on the 1st July, 1861, served a notice in writing on the plaintiff, that Bodine and Gulick owed him $216, due for rent, on the first day of the April preceding, and demanded the same of him as undertenant, forbidding the removal of any grain until said rent was paid. Immediately after this notice the defendant issued a distress warrant for the rent so due, by virtue of which the constable seized the grain in the sheaf and sold it. The plaintiff thereupon brought this action of trover to recover one-half of the value of the grain.

For plaintiff in error, *Theo. Little.*

For defendant, *H. C. Pitney.*

The opinion of the court was delivered by

BEASLEY, CHIEF JUSTICE.   In the argument before this court, one of the grounds taken by the counsel of the plaintiff in error, was that the defendant was the tenant of Bodine and Gulick.   But this position is not tenable.   Gulick and Bodine had leased the premises of the plaintiff for one year, and the defendant agreed with them to work the farm on shares. One of the original lessees was to occupy the house upon the place jointly with the defendant.   This arrangement, strictly speaking, was not a lease, nor did it constitute, technically, the defendant a tenant.   The opposite doctrine would be attended with much inconvenience, if not positive mischief. Landlords are induced to put out their farms, in this mode, to tenants who are poor, relying, as they imagine, on the certainty that their share of the produce cannot be diverted nor in anywise encumbered.   Whereas, if these agreements are complete leases, the title to the crops produced vests in the occupier, and the landlord would have no claim upon them until a division should have been made, and then his share would come to him as a *reditus* or rent.   Such is not the light in which the law regards this species of contracts.   On the contrary the true construction is, that by virtue of such agreements the occupier becomes simply a tenant in common, with the other contracting party of the growing crop, and that this joint interest continues until it is severed by a division.   *Caswell* v. *Districh*, 15 *Wend.* 379 ; *Putnam* v. *Wise*, 1 *Hill* 235 ; 4 *Kent's Com.* 95.

Regarding, then, the defendant as the owner of an undivided half part of the grain in controversy, the inquiry arises, could the whole of such grain be lawfully sold on the distress warrant issued against Bodine and Gulick, the owners of one undivided moiety of such grain, by their landlord, the plaintiff in error?

It is obvious that the question thus presented is simply, whether crops grown on a farm, differ, with regard to the incident of liability to distress for rent, from goods and chattels in general?   The familiar rule in this state on this

subject is, that the chattels of the tenant only can be seized
by the landlord—but it is now insisted that this rule does not
apply to the crops produced on the premises, but, on the con-
trary, that they are distrainable, whether they are the property
of a tenant or that of a third person.

The point thus raised turns wholly on the proper construc-
tion of the 8th section of the statute of this state concerning
distresses. *Nix. Dig.* 218.*    The entire structure of this
section betrays great want of skill in the draftsman; the
several provisions being thrown carelessly together, so that in
the confusion thus produced, the point to be investigated in
this case is certainly not clear from obscurity, if, indeed, it can
be said to be wholly free from doubt.    The following is a
brief analysis of its several provisions :

The first regulation is, that the landlord may seize, as a
distress for arrears of rent, any of the goods and chattels of
his tenant on the demised premises, *but not of any other per-
son,* although in his possession.

The design here was to modify the well known rule of the
common law, that all goods and chattels, with certain specific
exceptions, found on the demised premises, were subject to
seizure by the landlord for rent in arrear.    The change intro-
duced was, that no goods but those of the tenant should be
thus liable.

The second provision of the section is, that the landlord,
in like manner, may seize " any hogs, horses, cattle, or stock "
of his tenant, *but not of any other person,* feeding or depas-
turing on the demised premises, or upon any common append-
ant or appurtenant.

By the ancient rule of law, the cattle of the tenant, being on
a common appendant or appurtenant to the demised premises,
were not subject to the landlord's levy.    The office of this
clause is to extend his remedy to property of that description.

It is material to notice that in each of the foregoing pro-
visions the legislative intent is clear to confine the landlord's
lien strictly to the chattels of his own tenant.    The first clause

* *Rev., p.* 309, § 8.

imposes a restriction on his common law rights for the purpose of effecting this very limitation, and although the second clause is an extension of his common law rights, yet still it is expressly declared that the new class of subjects thus brought under his distress, must be the property of his tenant.

If this eighth section had stopped at this point, there would have been one species of chattels, often to be found on demised premises, which would not have been distrainable. Grain growing was, according to the general principles of law regulating this subject, exempt from distress. The first two clauses, therefore, of the section now under review, do not, nor does either of them, as it would seem, relate to grain growing—because, if the section had proceeded no further than the end of the second clause, growing grain would not have been distrainable at all. The legislature, then, having this new subject before them, proceed in the third clause, to dispose of it as a separate and distinct thing, in the following manner, viz., by declaring that the landlord may seize all wheat, &c., or other produce whatsoever, &c., "growing or being" on the premises. It will be observed that this language is very comprehensive; the expression is, "all grain growing or being" on the premises. And what lends peculiar significance to the generality of this language is, that while this clause is, in its general features, a substantial copy of the 8th section of the act, 11 Geo. II., c. 19, yet, with regard to the extent of the landlord's lien, it is an amplification of its English prototype. By the English act the distress was extended to grain "growing;" by our statute it is made to embrace not only grain "growing," but also all grain "being" on the demised premises. The intent to make the scope of the distress very broad with regard to this class of objects, appears to be manifest.

It is clear then that this language, the words being understood in their usual sense, will comprehend the grain in dispute. But this court is asked to limit, by construction, the natural force of the phraseology, and to declare that the expression "all grain" means, in the connection in which it is

used, the "grain of the tenant only." It is urged that a legislative purpose, inconsistent with the literal signification of the terms, of this third clause, can be gathered from the purview of the section. But such purpose is, at best, but faintly to be seen, and is, therefore, dubious, while the language of the third clause is clear and explicit. We are to remember that when this statute was passed, the legislature had under consideration this very subject of the proper limitations of the right of distress—and in the first two clauses of this section the right is circumscribed with care to the chattels of the tenant. When, therefore, in the third clause the right is unconfined and extended to all chattels of a certain description, without respect to the ownership of them, it certainly should require the most convincing evidence, before the court could assume that the law makers, by inadvertence, omitted in the third clause that restriction which they had just before interposed in the two clauses immediately antecedent. There is not sufficient, if anything, in the context, by which the usual import of the terms of the third clause can be restrained—and it consequently must be held to embrace the grain in dispute. It is not necessary for the purpose of this case to decide, whether grain not grown, but carried on to the demised premises, would be distrainable if owned by a stranger, under the operation of the clause above discussed. But it may be proper to remark, in passing, that besides the evident implications which would naturally arise against such construction, there are in the clause itself some indications that such was not the purpose of the law makers.

Before parting from this branch of the subject, it may be well to add that, although the precise question above considered has never, before the consideration of this case in the court below, received judicial criticism, yet nevertheless, it has not escaped the pains-taking diligence of Mr. Griffith, for in his Treatise (p. 267), this author remarks, commenting on this statute, " the act does not seem to exempt crops of other persons growing on the premises ; and that is as equitable as the other."

My conclusion, then, on this head, is that the plaintiff in error was justified, by force of his privilege as landlord, in seizing and selling the whole of the grain grown on the demised premises, although, at the time of such seizure, one-half of such grain was the property of the defendant in error, who was not his tenant.

But it was, in the next place, insisted on the argument, that admitting the landlord's right to distrain the property in question to the full extent claimed, yet still this action of trover was maintainable, on the ground that it appeared in the evidence, that the defendant in error was, at the time of such distress, a married man, having a family resident in this state, and was, consequently, entitled to an exemption of the value of two hundred dollars, by virtue of the act of the 18th of March, 1851.

Whether the act whose assistance is thus invoked can in any case be enforced, as it at present exists on the statute book, seems to be a matter of considerable doubt. It is certain that any attempt to carry its provisions into effect would be attended with much embarrassment. The act substantially provides that the goods and chattels privileged by law from distress for rent, shall thereafter be taken to be all such goods as are exempted on execution ; but the difficulty is, that there is no method appointed by which the goods so to be exempted on distress are to be ascertained. When goods are seized on execution, the formula established by the statute is that the sheriff shall appoint appraisers to value the property, and the defendant is to select articles from such valued inventory to the amount of two hundred dollars. But in this supplement to the distress act there is no direction of any kind, as to what steps are to be taken in order to set apart the exempted articles. Nor does it seem practicable, to apply to the distress the proceedings provided for executions. In the latter case the sheriff appoints the appraisers ; but who is to appoint them when the procedure is a landlord's warrant ? The landlord certainly would have no more

right to make a nomination of appraisers than the tenant would have.

But waiving any further consideration of the imperfections of this supplement, and passing without decision the question whether, on account of such imperfections, it can be put into practical operation, let us see how far, on the supposition of its suitability for use, it would affect the case now before the court.

The claim on the part of the defendant in error is, that although he is not the tenant of the plaintiff, he has a right to the benefits of this act. But it would seem that this construction would be neither within the spirit nor the letter of the statute. The policy in which these acts giving exemption is founded, is to prevent the families of poor persons from being stripped of the actual necessaries of life by force of legal process. Such laws are not intended to operate in favor of any other class of persons. To extend them to those who are in affluent circumstances, and consequently able to pay their debts, would be to apply laws which are just, to uses which would render them unjust. In their legitimate and normal operation, they are directed to the protection of defendants in execution and tenants under distress warrants, because in neither of these two classes of cases can the property reserved be ultimately retained, unless such defendants or tenants fall within the category of poor persons who are designed to be favored. This must be the result, because they are debtors to the party pursuing their property; and being such, they must be poor in order finally to hold the things exempted. But to stretch the privilege to a person between whom and the landlord no privity of contract exists, would be attended with a far different result. No matter how rich such party might be, he could still withdraw his share of the crops from the lien of the landlord and retain it, leaving the debt unpaid. For aught that appears in this case, the defendant in error may be a man of wealth; if so, can he be permitted to claim the benefit of this poor

man's privilege? Such is not the spirit of this or other similar statutes.

Nor is the defendant in error within the words of this supplement. The language is, "the goods and chattels mentioned in the 8th section of the act of which this is a supplement as privileged by law from distress for rent, shall hereafter be deemed and taken to be all such goods and chattels as now are or may hereafter be, by any law of this state reserved to any debtor for the use of his family against his creditors, &c." The operation of the act seems intended to be this: there were certain goods of the tenant privileged from distress; the clause just quoted provides that the goods so privileged should thereafter consist of such of the goods distrained as the tenant might select, to the value of two hundred dollars. The original privilege was that of the tenant; it was his goods which were distrained, some of them being privileged—and it would seem to follow, therefore necessarily, that the exemption substituted must be regarded as belonging only to such tenant. The fact is, the alteration in the law is not so much the creation of any new immunity as it is the definition and enlargement of an old one—the effect of the law being simply to specify what property of the tenant shall for the future, be embraced in the class formerly designated as privileged goods. The effect of the opposite construction would be most injurious to the landlord. If one vendee from the tenant can claim an exemption of the goods levied on to the value of $200, so could each of twenty vendees. The existence of so easy a method of defeating the right of the landlord to the crops as a pledge for his rent, would render such right almost worthless. The language of the act, as well as the principle in which it originated, have led me to the conclusion that it was not the design to bestow the privilege in question on any other description of persons besides tenants.

My conclusion on the whole case therefore is, that the landlord was entitled to seize and sell all the crops grown on the premises; that the defendant in error had no right to

claim any exemption from such distress, and that the ruling of the judge at the trial being contrary to law in these respects, the judgment of the court below should be reversed.

*For reversal*—BEASLEY, C. J., CLEMENT, CORNELISON, EEMER, FORT, GREEN, CH., KENNEDY, WALES.　8.

*For affirmance*—NONE.

CITED in *State* v. *Jewell, Collector,* 5 *Vroom* 260; *McQuade* v. *Emmons,* 9 *Vroom* 399; *Bird* v. *Anderson,* 12 *Vroom* 393.